# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

DR. HAROLD DAVIS,

        Plaintiff,

vs.                                                                                                         Civ. No. 01-799 MV/LFG

PROVIDENT LIFE AND ACCIDENT
INSURANCE COMPANY, UNUM LIFE
INSURANCE COMPANY OF AMERICA
(a/k/a UNUM PROVIDENT
CORPORATION), and JOHN DOES 1-10,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendants' Motion for Partial Summary Judgment on Plaintiff's Claim for Bad Faith Termination of Benefits, filed July 15, 2002, **[Doc. No. 97]**. The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that the motion is not well-taken and will be **DENIED.**

## FACTUAL BACKGROUND

This case arises from the alleged wrongful termination of Plaintiff's total disability benefits under two disability policies sold to Plaintiff by Defendants Provident Life and Accident Insurance Company and UNUM Life Insurance Company of America (a/k/a UNUM Provident Corporation)(collectively "Provident").[1] These policies provide monthly benefits in the event

---

[1] On Defendants' motion for summary judgment, the facts must be taken in the light most favorable to Plaintiff. Accordingly, in the recitation of the facts, the Court will describe the facts as supported by Plaintiff's evidence.

Plaintiff becomes totally disabled prior to a certain age. "Total disability" is defined by the policies as the inability to perform "the duties of your occupation," or "the substantial and material duties of your occupation" due to injury or sickness.

Plaintiff is an epidemiologist/pediatrician whose primary job duties consist of intellectually-demanding, but physically-sedentary, activities such as designing, conducting, and reporting epidemiological studies. Most days, Plaintiff's job requires him to sit at a computer for 6-7 hours.

Plaintiff suffers from Myofascial Pain Syndrome ("MPS") and/or Fibromyalgia ("FM"). MPS is a syndrome of muscle pain and stiffness characterized by trigger points--hyper-irritable spots in skeletal muscle that are associated with hyper-sensitive palpable nodules in a taut band. The symptoms of MPS range from incapacitating pain caused by very active trigger points to painless restriction of movement and distortion of posture due to latent trigger points. The symptoms of MPS vary in severity and intensity within a day, from day to day, and from week to week. FM is a syndrome of chronic pain affecting muscle groups of the neck, trunk, shoulders, hips and knees. Both MPS and FM are recognized by the medical profession as physical diseases, syndromes, or medical conditions that can cause debilitating pain.

In April 1999, Plaintiff submitted a claim for benefits under his disability policies, claiming to be totally disabled as of December 3, 1998, due to widespread pain from MPS and/or FM which prohibited him from standing or sitting in a static position for even short periods of time without significant pain. In addition to being unable to sit or stand in a static position without increased pain, Plaintiff's general level of pain adversely affected his ability to concentrate sufficiently to perform the scientific and medical research and analysis required by his job. Provident began paying

Plaintiff total disability benefits under a reservation of rights and initiated an investigation into Plaintiff's claim.

Plaintiff engaged in an intensive treatment and rehabilitation program for his condition, including seeing a chiropractor specializing in FM three times a week, an accupuncturist twice a week, a massage therapist twice a week, an internist every two weeks for medication management, and a rheumatologist every six to nine weeks. As part of his treatment, Plaintiff, upon the advice of his medical providers, engaged in physical exercise, including stretching, exercise classes, walking, swimming, and cross-country skiing. Plaintiff persisted with his rehabilitative exercise program despite significant pain that required treatment with a number of narcotic analgesics, including Oxycontin.

In accordance with the policies, Plaintiff and his physicians submitted monthly statements and medical records to Provident detailing Plaintiff's current symptoms, treatment, and restrictions. The statements reported that Plaintiff was able to care for himself, including shopping for food, cooking and going to health care appointments, and was walking, swimming, and cross-country skiing. These statements reflect the waxing and waning of Plaintiff's symptoms, sometimes reporting that Plaintiff was able to increase physical activity and decrease pain medication and other times reporting a worsening in Plaintiff's symptoms that limited previously tolerated activities. The statements consistently reported that Plaintiff experienced increased pain upon sitting or standing in static positions for short periods of time.

As part of its investigation of Plaintiff's claim, Provident hired investigators to observe and report on Plaintiff's daily activities for several days in June, July and August of 1999 and February of 2000. The surveillance showed Plaintiff, on various days, attending doctor's appointments,

participating in an exercise class, driving to and from a cross-country ski area, cross-country skiing, swimming, running short errands, and visiting a library. On at least two of the days he was being observed by Provident's surveillance agents, Plaintiff left his home only to attend an exercise class.

Plaintiff's file, including the surveillance reports and videos, was reviewed by Pamela Taylor, a nurse employed by Provident. Nurse Taylor, who had very limited knowledge of MPS and FM, concluded that Plaintiff's observed daily activities were inconsistent with Plaintiff's reported limitations and restrictions:

> 1. Are [restrictions and limitations] reported consistent with observed activities? Consistent with reported ability levels?
>
> Insured's [restrictions and limitations] are listed as "after sitting or standing for 30-40 minutes, Dr. Davis has so much pain that he has to lie down for 15-20 minutes. In addition, when Dr. Davis has tried to sit or stand for three hours in a single day, he develops long-lasting pain that prevents him from sitting or standing for thirty minutes during the next three to four weeks." Based on insured's observed activities, he is seen driving (sitting) for an hour to the cross-country ski resort. After arrival at the ski resort, he proceeds to put on his skis and cross-country ski the most difficult trails for approximately three hours. He then drives (sits) an hour back home. This activity is not consistent with either his reported activity levels or his listed [restrictions and limitations]. Insured is also observed at other times in activities inconsistent with his reported [restrictions and limitations].
>
> 2. Are [restrictions and limitations] imposed upon Dr. Davis by a physical condition which would preclude the performance of his occupational duties?
>
> Insured's observed activities indicate a level of conditioning to which he would have to work to maintain. It would seem that if insured is able to maintain this level of conditioning and routinely engage in the activities he is doing, that he could certainly perform the duties of his occupation.

On May 5, 2000, Plaintiff called Provident and was informed that his disability benefits were being terminated.

On May 10, 2000, Nurse Taylor's report was reviewed by Dr. Beecher, one of Provident's

in-house physicians. Dr. Beecher concurred with Nurse Taylor's conclusions, writing that "the picture is one of inconsistencies and considerable psychosocial overlay and malingering is a possibility as well, given the gross inconsistencies in his file." Dr. Beecher, in responding to the same questions addressed by Nurse Taylor, wrote:

> 1. No. Activities observed - skiing for 3 hours and driving for a 1 hour period on either side of this are not consistent with his reported abilities. The ability to do this and to swim the number of continuous laps, that he was observed swimming, implies a high level of conditioning that would be a result of regular--daily to several times/week--high level aerobic exercise. It is is [sic] very unusual for highly conditioned muscles to produce chronic myofascial pain. However, if exercise is done to the point of damage to the muscle, myofacial tightness and pain can occur. If this happens occasionally, it may just be a sign of poor attention or unrealistic expectations. If it happens on a daily basis this may well be a form of self inflicted bodily injury.
>
> 2) No. Dr [sic] Davis is self limiting and telling his medical providers what he can and can't do. They in turn are accepting this at face value and some are actively supporting disability. His job is apparently mostly done sitting, and that is what he says he can't do. There is insufficient medical evidence to support a physical medical disorder that would explain his complaints and claimed impairment. Since this is so subjective and there is a possibility of self induced injury, we need to rely most heavily on what his observed activies [sic] have been. In my opinion these observed activities are compatible with the physical capacity to do a sedentary to light, or more, physical demand job.

In a letter dated May 12, 2000, Provident informed Plaintiff that his benefits were being terminated because his "spontaneous daily activities [we]re not consistent with [his] claimed and reported restrictions and limitations, leading [Provident] to conclude that [Plaintiff was] capable of performing the duties of [his] occupation." Provident cited to excerpts from Nurse Taylor and Dr. Beecher's reports as the basis for its decision to terminate Plaintiff's benefits.

Provident refused to provide any additional information regarding the alleged inconsistencies between Plaintiff's stated restrictions and limitations and his observed activities,

5

including the surveillance reports.  Plaintiff, despite being denied significant information regarding the basis for Provident's decision, attempted to appeal the termination of his benefits.  In his appeal, Plaintiff provided reports from two of his treating physicians regarding his disability, his "Notice of Award" of disability benefits from the Social Security Administration, and seven articles on MPS and FM from medical journals.  Plaintiff also authorized the release of medical information to Provident from sixteen of his previous medical providers.

Plaintiff's appeal was reviewed by Dr. Beecher.  In her appellate report, Dr. Beecher noted that Plaintiff's treating physicians agreed that Plaintiff had a number of physical symptoms and was disabled.  Dr. Beecher disagreed, however, noting that "we all know many people with tender points, trigger points, myofacial bands and muscle spasm that are working every day and managing to live with it."  Based on Dr. Beecher's review, Provident upheld its decision to terminate benefits.

Plaintiff filed a complaint in the First Judicial State District Court against Provident and John Does 1-10, alleging breach of contract, insurance bad faith, violation of the New Mexico Insurance Practices Act, violation of the Unfair Trade Practices Act, joint venture for illegal purposes, civil conspiracy, aiding and abetting, and *prima facie* tort.[2]  On July 11, 2001, Provident removed this case to this Court.  On July 15, 2002, Provident filed this motion seeking partial summary judgment on Plaintiff's claim for bad faith termination of benefits.

## **LEGAL STANDARD**

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are

---

[2] Plaintiff subsequently abandoned his joint venture for illegal purposes, civil conspiracy, aiding and abetting, and *prima facie* tort claims.  *See* Plaintiff's Response to Court Order, dated February 12, 2004.

intended to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  Under Rule 56(c), summary judgment is appropriate when the court, viewing the record in the light most favorable to the nonmoving party, determines that "there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Thrasher v. B & B Chem. Co., Inc.,* 2 F.3d 995, 996 (10th Cir. 1993).

The movant bears the initial burden of showing "there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  Once the movant meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id*. at 324 (quoting Fed. R. Civ. P. 56(e)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non- moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation omitted).

Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, *Pittsburg & Midway Coal Min. Co. v. Yazzie,* 909 F.2d 1387, 1427 (10th Cir. 1990), the burden on the moving party may be discharged by demonstrating to the court that there is an absence of evidence to support the nonmoving party's case, *Celotex,* 477 U.S. at 325.  In such a situation, the moving party is entitled to judgment as a matter of law "because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 322.

**DISCUSSION**

Provident asserts that it had a factual basis for its decision to terminate Plaintiff's benefits and, therefore, Plaintiff's bad faith claim fails as a matter of law. To demonstrate bad faith under New Mexico law, there must be no reasonable basis for denying the claim. *See United Nuclear Corp. v. Allendale Mut. Ins. Co.*, 709 P.2d 649, 654 (N.M. 1985). An insurer's incorrect decision regarding coverage, without more, is not enough to establish bad faith. The New Mexico Supreme Court has stated:

> "Bad faith" has been defined as "any frivolous or *unfounded* refusal to pay." "Unfounded" in this context does not mean "erroneous" or "incorrect"; it means essentially the same thing as "reckless disregard," in which the insurer *utterly* fails to exercise care for the interests of the insured in denying or delaying payment on an insurance policy. It means an utter or total lack of foundation for an assertion of nonliability--an arbitrary or baseless refusal to pay, lacking any arguable support in the wording of the insurance policy or the circumstances surrounding the claim. It is synonymous with the word with which it is coupled: "frivolous."

*Jackson Nat'l Life Ins. Co. v. Receconi*, 827 P.2d 118, 134 (N.M. 1992) (emphasis in original) (internal cites and quotes omitted); *see also Sloan v. State Farm Mut. Auto. Ins. Co.*, 2004-NMSC-004 (reiterating this standard as applicable to a first-party failure-to-pay claim). Whether an insurer's actions give rise to an inference of bad faith "must be determined 'in light of all facts known or knowable concerning the claim' at the time plaintiff requested the company to perform its contractual obligation." *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1439 (10th Cir. 1993) (citing *Conti v. Republic Underwriters Ins. Co.*, 782 P.2d 1357, 1362 (Okla. 1989)).

Plaintiff has submitted evidence from which a reasonable jury could find that Plaintiff suffers from MPS and/or FM; that these diseases cause Plaintiff significant pain, which affects Plaintiff's ability to concentrate; that the symptoms of these diseases wax and wane in severity, with pain

intensity varying within a day, from one day to another, and from one week to another; that aerobic exercise is a recommended and appropriate treatment for these diseases; and that Plaintiff's pain is more severe when he sits or stands in a static position. These facts were known, or knowable, to Provident when it made the decision to terminate Plaintiff's benefits.

Despite the fact that the pain from MPS can vary significantly from day to day and week to week, and, therefore, Plaintiff's ability to perform certain activities similarly varies, Provident denied Plaintiff's benefits based on alleged discrepancies between Plaintiff's reported restrictions and limitations from one time period with his observed activities in another time period. A reasonable jury could find that Provident's use of a comparison of activities from one time period with reported limitations and restrictions from another time period as a basis to deny benefits is unfounded and frivolous.

In addition to being unable to physically perform his job duties, Plaintiff alleged that he was unable to perform his job duties because the pain from MPS and/or FM affected his ability to concentrate sufficiently to perform technical medical and scientific research. Provident did not make any effort to determine if Plaintiff could perform the intellectual duties of his job when determining that he had the physical ability to work. A reasonable jury could find that Provident's failure to consider the affect of Plaintiff's pain on his ability to perform his intellectually-demanding job when making its decision to terminate Plaintiff's disability benefits was unfounded and frivolous. *See, e.g., Morgan v. UNUM Life Ins. Co. of America*, 346 F.3d 1173, 1178 (8th Cir. 2003) (doctor's opinion on the physical limitations of a person impaired by fibromyalgia "was at best tangentially relevant to [plaintiff's] circumstance of being disabled by the cognitive deficits rather than the physical limitations he suffered due to fibromyalgia and insomnia."); *Carson v. Canada*

9

*Life Assurance Co.*, Nos. 01-1418, 01-1452, 2002 WL 99736 at *5 (4th Cir., Jan. 1, 2002) (failure to consider plaintiff's ability to perform job duties due to decrease in ability to concentrate from fibromyalgia supported finding that insurance company breached the implied covenant of good faith and fair dealing).

In addition, the nurse and doctor at Provident who reviewed Plaintiff's claim and determined that he was not disabled were not experts in the rare and complex diseases suffered by Plaintiff. In fact, Nurse Taylor testified that she had only about five hours of training in MPS and FM. Provident did not speak to Plaintiff's doctors, who were experts in Plaintiff's diseases, regarding his diagnosis, symptoms, treatment, and restrictions, did not seek the advice of independent experts in these diseases, and did not perform an independent medical examination of Plaintiff. Provident's use of its own nurse and non-treating/examining physician, neither of whom appears to have any expertise in the area of Plaintiff's diseases, to contradict the findings of Plaintiff's treating physicians, who were experts in his diseases, could support a finding of bad faith. *See, e.g., id.* (fact that doctors at insurance company who made determination regarding plaintiff's disability were not specialists in fibromyalgia and did not seek professional advice of a specialist in fibromyalgia supported finding that insurance company breached the implied covenant of good faith and fair dealing); *Cohen v. Standard Ins. Co.*, 155 F.Supp.2d 346, 352 (E.D.Pa. 2001) (insurance company's reliance "upon the opinion of its non treating physicians over plaintiff's treating physicians is suspect").

Plaintiff provides additional evidence which a reasonable jury could find supports a finding of bad faith. For example, Provident asserts that its decision to terminate Plaintiff's benefits was based on a review of Plaintiff's file by Ms. Taylor and Dr. Beecher. Plaintiff has presented evidence

demonstrating that, contrary to Provident's statements, Provident made the decision to terminate Plaintiff's benefits before Dr. Beecher reviewed his file.  Provident also relied on inaccurate characterizations of Plaintiff's observed activities.  For example, Provident states that the surveillance tapes show Plaintiff standing continuously for "over an hour on July 29, 1999" contrary to his reported limitation of being unable to stand in a static position for more than a short period of time without a significant increase in pain.  A review of the surveillance tape, however, shows Plaintiff standing and performing stretching and rhythmic exercises, not standing in a static position.  Similarly, both Nurse Taylor and Dr. Beecher state that the surveillance showed that Plaintiff drove one hour to a ski area, skied for three hours, and drove an hour home.  Plaintiff, however, has provided evidence that he stopped and stretched after driving 25 minutes on his way to the ski area; that he was on the ski trails for less than two hours; and that during the time he was out on the ski trails, he, in accordance with his rehabilitative exercise program, alternately skied, stretched, and rested.

     Viewing the record in the light most favorable to Plaintiff, a reasonable jury could find that Provident's denial of disability benefits was unfounded and frivolous. Consequently, Provident is not entitled to summary judgment on Plaintiff's bad faith termination of benefits claim.

## CONCLUSION

**IT IS FURTHER ORDERED** that Defendants' Motion for Partial Summary Judgment on Plaintiff's Claim for Bad Faith Termination of Benefits, filed July 15, 2002, **[Doc. No. 97]**, is hereby **DENIED.**

Dated this 10th day of June, 2004.

_____
MARTHA VÁZQUEZ
U. S. DISTRICT COURT JUDGE

Attorneys for Plaintiff:
  Steve Vogel, Esq.
  Esteban A. Aguilar, Esq.

Attorneys for Defendant:
  Thomas L. Johnson, Esq.
  Kerri L. Peck, Esq.